**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

ANDRE G. BOUCHARD
CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

Date Submitted: May 15, 2018
Date Decided: August 31, 2018

Sean T. O'Kelly, Esquire
Ryan M. Ernst, Esquire
O'Kelly Ernst & Joyce, LLC
901 North Market Street, Suite 1000
Wilmington, DE 19801

Michael W. McDermott, Esquire
Sean A. Meluney, Esquire
Berger Harris LLP
1105 North Market Street, 11th Floor
Wilmington, DE 19801

RE:   *Jennifer L. Stritzinger v. Dennis Barba, et al.*
      Civil Action No. 12776-CB

Dear Counsel:

This letter constitutes the court's decision on defendants' motion to dismiss the Second Amended Complaint, which asserts a claim for breach of fiduciary duty and seeks the appointment of a receiver. For the reasons explained below, the motion to dismiss is granted.

## I.     Background

The facts recited in this letter decision are drawn from the Verified Second Amended Derivative Complaint (the "Second Amended Complaint") filed on February 16, 2018, and documents incorporated therein.[1] Any additional facts are either not subject to reasonable dispute or subject to judicial notice.

---

[1] *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) (citations omitted)

## A.      The Parties

Plaintiff Jennifer L. Stritzinger is a stockholder, but not a dues-paying member, of nominal defendant Newark Country Club (the "Club").

Defendants are the twelve members of the Club's board of directors (the "Board"):  Dennis Barba, Ron Holliday, Michael Barrow, Cheree McPhee, Fred Mink, Fritz Land, Todd Ladutko, Bob Kennedy, Charlotte Short, Chris Scherf, Tom Hall, and Jim Brown (the "Director Defendants").  Barba was the president of the Club during the relevant period and Scherf is the current president.

## B.      The Club Faces Financial Difficulties

The Club was formed in 1921.  It is a private corporation governed by the Delaware General Corporation Law, 8 *Del. C.* § 101 *et seq.*, that operates as a country club, with a club house, a golf course, and related operations in Newark, Delaware.  The Club's most meaningful asset is the land it owns.  Before the transaction at issue in this case, there were three mortgages on that property totaling approximately $1.8 million.

---

("[P]laintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms" in connection with a motion to dismiss).

Over the years, developers have approached the Club and the Board with proposals to purchase and develop the Club's land. The Board has rejected all such proposals, despite the Club having "operated at a deficit for years," including net losses of $266,252 in 2014, $242,154 in 2015, and $416,392.70 in 2016.[2] According to Stritzinger, the "decisions to reject these proposals were not done in the interests of protecting the value belonging to the Club and its equity stockholders, but instead were done with the goal of maintaining control of the country club and allowing its club members to enjoy its recreational offerings and facilities."[3]

## C. The Newark Country Club Mortgage Company

On May 21, 2016, one of the defendants, Ladutko, emailed his fellow Board members a proposal to relieve the pressure on the Club's "cash flow problems."[4] Specifically, Ladutko suggested that members of the Club create a limited liability company to loan money to the Club, with the loan to be secured by another mortgage on the Club's property (the "Loan"). The Board was receptive to the idea, and Barba sent an email to the Club's members regarding the proposed plan to raise financing for club operations.

---

[2] Second Am. Compl. ¶ 31.

[3] *Id.* ¶ 39.

[4] *Id.* ¶ 41.

On June 16, 2016, the Club held a "town hall meeting" at which its members discussed the Club's long-term plans. The Club's members discussed four options: (i) merging with another club; (ii) selling the Club to a land broker, but allowing the Club to continue its operations for ten years; (iii) working with the city of Newark for it to purchase the development rights of the property; and (iv) forming Newark Country Club Mortgage Company, LLC (the "Mortgage Company") to make the Loan to the Club.[5] The Board chose to pursue the Mortgage Company option.

On July 21, 2016, Barba solicited a $100,000 bridge loan to cover the Club's "annual shortfall."[6] Barba referenced the proposed Mortgage Company in his request for additional funds from Artisan's Bank, a bank with which the Club already had a $150,000 line of credit. The Board set a deadline of September 30, 2016 for Club members and equity holders to participate in the Mortgage Company through the sale of membership interests, with the proceeds to be loaned to the Club. The interest rate on the Loan would be 5.75% per annum, paid bi-annually, and the Club would grant the Mortgage Company a mortgage on the Club's property.

Some Club members raised concerns about the proposed transaction. In response, the Board circulated answers to "Frequently Asked Questions" on

---

[5] Second Am. Compl. ¶ 46.

[6] Second Am. Compl. ¶ 49.

September 26, 2016. This document described how the proceeds of the Loan would be used. Specifically, it stated that the funds would be used to repay certain of the Club's short-term obligations but would not secure the long-term financial future of the Club.

On December 4, 2016, the Board formally adopted a financing agreement with the Mortgage Company. Five of the twelve members of the Board—Kennedy, Ladutko, Scherf, Short, and Land—invested in the Mortgage Company. They all recused themselves from the Board vote authorizing the transaction.

On January 4, 2017, the Mortgage Company loaned the Club $399,000 at an interest rate of 5.75%.[7] The proceeds of the Loan allegedly were used to pay off the Club's line of credit with Artisan's Bank and a portion of back taxes it owed.[8]

## II.     Procedural History

On September 27, 2016, after serving a books and records demand on the Club a few months earlier, Stritzinger filed her initial complaint along with a motion for expedited proceedings and a motion for a temporary restraining order seeking to enjoin the Club from closing the Loan transaction. Two days later, Stritzinger withdrew her motion for a temporary restraining order.

---

[7] Second Am. Compl. ¶¶ 60-61.

[8] Second Am. Compl. ¶ 61.

On October 28, 2016, Stritzinger again sought expedition. On November 3, 2016, the court denied the renewed motion for expedition based on, among other things, Stritzinger's failure to demonstrate a sufficient threat of irreparable harm given the availability of a damages remedy. Over ten months later, on September 14, 2017, Stritzinger amended her complaint, which defendants moved to dismiss. In lieu of briefing that motion, Stritzinger amended her complaint a second time without opposition from defendants.

On February 16, 2018, Stritzinger filed the Second Amended Complaint, asserting two claims. On February 21, 2018, defendants moved to dismiss these claims under Court of Chancery Rules 23.1 and 12(b)(6) for failure to make pre-suit demand on the Board and failure to state a claim for relief.

## III.   Analysis

Count I of the Second Amended Complaint asserts a claim for breach of fiduciary duty against the Director Defendants. Count II seeks the appointment of a receiver for the Club. I address defendants' motion to dismiss with respect to each claim, in turn, below.

### A. Plaintiff Has Failed to Establish that Making a Demand Would Have Been Futile With Respect to Count I

Count I asserts that the Director Defendants breached their fiduciary duty by approving the Loan with the Mortgage Company.[9] This claim, which seeks an award of compensatory damages to be paid to the Club, is asserted derivatively on behalf of the Club.

"[S]tockholders may not prosecute a claim derivatively on behalf of a corporation unless they: (1) make a pre-suit demand by presenting the allegations to the corporation's directors, requesting that they bring suit, and showing that they wrongfully refused to do so, or (2) plead facts showing that demand upon the board would have been futile."[10] Stritzinger did not make a demand on the Board, so she must demonstrate that a majority of the members of the Board when this action was filed was "incapable of making an impartial decision regarding such litigation."[11]

The parties agree that the test articulated in *Aronson v. Lewis*[12] applies in this case to determine whether demand would have been futile with respect to Count I.[13]

---

[9] Second Am. Compl. ¶¶ 72-78.

[10] *Carr v. New Enter. Assocs., Inc.*, 2018 WL 1472336, at *12 (Del. Ch. Mar. 26, 2018) (citations and internal quotations omitted).

[11] *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).

[12] 473 A.2d 805 (Del. 1984).

[13] Defs.' Opening Br. 8-14 (Dkt. 32); Pl.'s Answering Br. 11-15 (Dkt. 35).

This is the correct standard because (i) Count I challenges an affirmative decision of the Board, *i.e.*, the decision for the Club to enter into the Loan transaction with the Mortgage Company, and (ii) a majority of the directors who made that decision remained in office at the time this suit was filed.[14]  In fact, the same twelve individuals who approved the Loan transaction constituted the Board when this litigation was filed and Count I was first asserted.

Under the *Aronson* test, "to show demand futility, [a] plaintiff[] must provide particularized factual allegations that raise a reasonable doubt that (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."[15]

With respect to the first prong of the *Aronson* test, Vice Chancellor Lamb summarized the nature of the inquiry based on the precise text of *Aronson* as follows:

> Disinterested "means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally."  "Independence means that a director's decision is based on the corporate merits of the

---

[14] *See Rales*, 634 A.2d at 933-34 (citations omitted) (*Aronson* test does not apply "(1) where a business decision was made by the board of a company, but a majority of the directors making the decision have been replaced; (2) where the subject of the derivative suit is not a business decision of the board; and (3) where, as here, the decision being challenged was made by the board of a different corporation").

[15] *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009) (citation and internal quotations omitted).

subject before the board rather than extraneous considerations or influences."[16]

Amplifying on the concept of independence, this court has explained that the "inquiry asks whether the uninterested members of the board are dominated or beholden to the interested members in such a way that their independence and objectivity is questionable."[17]

With respect to the second prong of the *Aronson* test, this court recently explained the pleading burden on plaintiff, in relevant part, as follows:

> Under the second prong of *Aronson*, the "plaintiff[ ] must plead particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision." In order to raise a reason to doubt good faith, "the plaintiff must overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests" and was "essentially inexplicable on any ground other than bad faith." This requires a pleading of "particularized facts that demonstrate that the directors acted with scienter; i.e., there was an 'intentional dereliction of duty' or a 'conscious disregard' for their responsibilities." This is a high burden, requiring an "extreme set of facts." The most salient examples include (1) "where the fiduciary intentionally breaks the law"; (2) "where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation"; or (3) "where the fiduciary intentionally fails to act in the face of a known

---

[16] *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 821 (Del. Ch. 2005) (quoting *Aronson*, 473 A.2d at 812, 816).

[17] *TVI Corp. v. Gallagher*, 2013 WL 5809271, at *8 (Del. Ch. Oct. 28, 2013).

duty to act." While "aspirational goals of ideal corporate governance practices" may be "highly desirable," to the extent they "go beyond the minimal legal requirements of the corporation law," they "do not define standards of liability."[18]

The Second Amended Complaint pleads, and defendants do not dispute, that five of the twelve members of the Board had a personal financial interest in the Loan transaction due to their investments in the Mortgage Company that made the Loan. As to the remaining seven directors, the Second Amended Complaint does not plead facts suggesting that any of them had a personal financial interest in the Loan transaction, or that any of them were beholden to any of the five directors who did so as to call into question their independence. Thus, Stritzinger has failed to plead particularized facts sufficient to raise a reason to doubt that a majority of the Board was disinterested and independent, as those terms are defined above. Accordingly, Stritzinger necessarily would fail to satisfy the first prong of the *Aronson* test if the scope of its inquiry is limited in the manner articulated above.

Stritzinger argues, however, for a broader inquiry under the first prong of *Aronson*. Specifically, she argues that the first prong of *Aronson* is satisfied because

---

[18] *Lenois v. Lawal*, 2017 WL 5289611, at *10 (Del. Ch. Nov. 7, 2017) (citations omitted).

(i) five members of the Board benefited personally from the Loan transaction[19] and (ii) the remaining seven members of the Board were not disinterested because they acted in bad faith when they approved the Loan transaction and thus face a substantial threat of personal liability for taking that action.[20] As I understand her position, Stritzinger asserts the same theory of bad faith as the basis for her argument that the second prong of *Aronson* has been satisfied.[21]

There appears to be some confusion in our law whether the "substantial likelihood of liability" theory used to challenge the impartiality of a director for demand futility purposes fits within the analysis contemplated by the first or second prong of *Aronson*. As a leading treatise explains:

> Whether a director is "interested" for demand futility purposes because he or she faces "a substantial likelihood of liability" is typically considered by courts in the *Rales* context . . . . In some cases, the Court of Chancery has also considered whether a director faces a "substantial likelihood of liability" in determining whether the first prong of *Aronson* is satisfied, while other courts have referred to this phrase in the context of *Aronson's* second prong. In one case, the Court of Chancery explained that while "substantial likelihood of liability" is not the "pertinent question" under the *Aronson* test, a "crucial factor"

---

[19] Stritzinger asserts that the five members who invested in the Mortgage Company were "not independent." Pl.'s Answering Br. 10. The correct characterization under our law is that they were not disinterested.

[20] Pl.'s Answering Br. 10-13.

[21] *Id.* 13-15.

underlying *Aronson* "would seem to be questions of the potential for
personal liability which affect capacity to consider demand."[22]

The briefing in this case is far too undeveloped for me to attempt to provide clarity
on this issue. Fortunately, it is not necessary to do so because, as discussed below,
the Second Amended Complaint fails to plead particularized facts that any of the
seven members of the Board who approved the Loan—all of whom are exculpated
from monetary liability for breaches of the duty of care[23]—acted in bad faith.

The gravamen of the Second Amended Complaint is that these seven directors
acted in bad faith because their approval of the Loan served the interests of the
Club's dues-paying members (some of whom are stockholders) who use its facilities
to the detriment of the Club as an entity and those stockholders who do not use the
Club's facilities. As alleged in the Second Amended Complaint:

> The Company continually operates at a loss and seeks to borrow
> increasing amounts of capital without actually devising or executing a
> plan to increase revenue. Whenever the Board is presented a financial
> opportunity that entails a change to the Club's functions and a

---

[22] 3 FOLK ON THE DELAWARE GENERAL CORPORATION LAW (Edward P. Welch et al. eds.,
6th ed. 2018) § 327.04[B][4][n] (citations omitted).

[23] *See* Defs.' Opening Br. Ex. 1.

12

disruption to the members' enjoyment of their beloved facilities, the Board rejects it in favor of continuing operations at a loss.[24]

. . . .

. . . [T]he act of entering into the Mortgage transaction – which drained the equity of the Company to pay outstanding bills, with no plan to turn around the Club's finances – is improper. The Mortgage only provided short-term breathing room, not a long-term solution.[25]

In my opinion, Stritzinger has not plead the type of extreme set of facts necessary to support a reasonable inference that the seven members of the Board who approved the Loan transaction acted in bad faith. To start, the Second Amended Complaint does not challenge the commercial reasonableness of the terms of the Loan, which include a 5.75% interest rate and security in the form of a mortgage on the Club's property that is subordinated to the Club's other debt. To the contrary, Stritzinger tacitly concedes that the terms of the Loan are commercially reasonable.[26]

The Second Amended Complaint also does not plead facts suggesting that the members of the Board intentionally disregarded their fiduciary obligations as to the process they undertook in considering the Loan transaction. Rather, the Second Amended Complaint acknowledges that the Club held a "town hall meeting" where

---

[24] Pl.'s Answering Br. 13-14 (citing Second Am. Compl. ¶¶ 30-40, 46-49).

[25] *Id.* at 14-15.

[26] *See* Pl.'s Answering Br. 14 ("The terms of the Mortgage, however, are not what make it unreasonable.").

at least three options were discussed other than the Loan transaction, including selling the Club, and that the five members of the Board with an interest in the Loan "recused themselves from the Board vote authorizing the transaction."[27]

What Stritzinger's grievance boils down to is a disagreement with the *substance of the decision* the Board made to approve the Loan transaction. Her pleading makes clear that she disagrees with the Board's decision to borrow funds to address the Club's near-term financial pressures so that the Club could continue to operate—as it has for generations—as a country club. Stritzinger, who does not use the Club's facilities, wanted the Board to reject the Loan, even if that meant liquidating the Club and selling off its land.[28] In short, Stritzinger's disagreement with the Board concerns quintessential matters of business judgment concerning the strategic management of the Club's affairs. What her allegations do not do, however, is provide particularized facts from which the court reasonably could infer that the decision to enter into the Loan was so egregious or irrational that it could not have been based on a valid assessment of the Club's best interests, or that the

---

[27] Second Am. Compl. ¶¶ 46, 60.

[28] According to defendants, Stritzinger and her husband have tried for over a decade to build homes on the Club's land. Defs.' Reply Br. 10-11 & Ex. A (Dkt. 37). Defendants thus argue that Stritzinger would not be an adequate derivative plaintiff if this case proceeds. I do not need to reach this issue given my conclusion that this case must be dismissed for the reasons explained above.

14

directors who approved the Loan otherwise acted with the requisite intent to disregard their obligations.

Given that the Second Amended Complaint fails to plead particularized facts sufficient to raise a reason to doubt that a majority of the Board (*i.e.*, the seven directors who approved the Loan) (i) had no personal financial interest in the Loan transaction, (ii) were independent, and (iii) acted in good faith, Stritzinger has failed to establish demand futility. This is true whether plaintiff's contention that these individuals face a substantial threat of personal liability is analyzed under the first or second prong of *Aronson*. Accordingly, Count I must be dismissed based on Stritzinger's failure to make a pre-suit demand on the Board.

### B.    Count II Fails to State a Claim for Relief

Count II of the Amended Complaint seeks the appointment of a receiver "to manage" the Club.[29] Without relying on any statutory basis, Stritzinger seeks this relief on the theory that the "Director Defendants have recklessly mismanaged the corporate business of [the Club] by approving the financing transaction and failing to devise, let alone execute, a[] strategy to stop the [Club] from losing money every year."[30]

---

[29] Second Am. Compl. ¶ 83.

[30] Second Am. Compl. ¶ 81.

Defendants have moved to dismiss Count II under Court of Chancery Rule 12(b)(6). The standards governing a motion to dismiss for failure to state a claim for relief are well-settled: "(i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the 'plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'"[31]

Using its equitable powers, the court may appoint "a custodian or receiver upon a showing of fraud, gross mismanagement, positive misconduct by corporate officers, breach of trust, or extreme circumstances showing imminent danger of great loss which cannot otherwise be prevented."[32] "The appointment of a custodian or receiver on the ground of mismanagement calls for a cautious exercise of discretion of the Court. Such form of relief is radical and should be granted grudgingly."[33]

Even viewing the factual allegations pled in the light most favorable to Stritzinger, she has not come close to alleging grounds for the court to take the

---

[31] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (citations omitted).

[32] *Zutrau v. Jansing*, 2013 WL 1092817, at *5 (Del. Ch. Mar. 18, 2013).

[33] *Barry v. Full Mold Process, Inc.*, 1975 WL 1949, at *2 (Del. Ch. June 16, 1975) (citations omitted).

extraordinary step of displacing the Board from managing the Club's affairs by appointing a receiver. As discussed above, the allegations of the Second Amended Complaint do not raise a reason to doubt the good faith of the directors who approved the Loan transaction. Apart from criticizing the Loan transaction, Stritzinger's allegations concerning the Board's historical management of the Club are wholly conclusory and unsubstantiated. Stritzinger has not even alleged that the Club is insolvent or that insolvency is imminent due to the Board's mismanagement of the Club. In short, based on the facts pled, there is no reasonably conceivable basis on which the court would exercise its discretion to appoint a receiver for the Club. Accordingly, Count II fails to state a claim for relief.

## IV. Conclusion

For the reasons explained above, defendants' motion to dismiss the Second Amended Complaint with prejudice is **GRANTED**.

**IT IS SO ORDERED.**

Sincerely,

*/s/ Andre G. Bouchard*

Chancellor

AGB/gm

17